## OSCAR REIERSON v. LAND O' LAKES CREAMERIES, INC., AND ANOTHER.

177 N. W. (2d) 301.

May 15, 1970—No. 41990.

*C. Douglas Allert,* for relators.

*Brink, Sobolik & Severson* and *Robert K. Severson,* for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Theodore B. Knudson, JJ.

MURPHY, JUSTICE.

Certiorari to review a decision of the Workmen's Compensation Commission awarding disability benefits and medical expenses to respondent-employee, Oscar Reierson. Relator-employer, Land O' Lakes Creameries, Inc., and relator-insurer, The Travelers Insurance Company, ask for a reversal, contending that employee has not sustained his burden of proof that the disease of dermatomyositis arose out of and in the course of his employment.

From the record it appears that Reierson, age 64 at the time of the hearing, began his employment with Land O' Lakes at their feed mill and elevator in Thief River Falls, Minnesota, in 1955. He performed general labor work of a seasonal variety which lasted from approximately March to October of each year. He owned and operated a 240-acre farm while working at the elevator. During the first week of September 1965, he was directed to clean the pit area below the elevator scales. The area is described in the commissioner's opinion as follows:

"* * * This was a closed area containing fine dust, grain dust, dirt, chaffings of corn and oats and other types of grain. Some of the dust was fine and dry and other parts of the area were filled with a fermented wet dust. The area had a strong smell, contained dead rats and mice and other debris that had been accumulating for many years. An exterminating company on a monthly basis set rat and mice poisons of liquid and solid types, probably of the blood-thinner type, and in addition fumigated the area. The work in this area was extremely dirty and Reierson and his fellow-employee found they could only work there for approximately two hours and had to come out from time to time."

A fellow employee gave this description of the area:

"Well, it is I will just say I would rather stay at home as go down there. They caught you there when you were there so you had to go down there and do it. It is a lot of dust and dirt and wet rotten feed, dead rats, rat traps, and just a heck of a mess is what it amounts to. * * * [Y]ou didn't have to worry about supper when you come home."

Although Reierson had performed a similar task in previous years, he had never worked on it more than one or two days at a time. After he had worked in the pit area for about a week or 10 days, he noticed that his hands and face had broken out in a rash. He consulted a local doctor who diagnosed the condition

as contact dermatitis and prescribed for it. When the condition did not respond to treatment, he saw another area doctor who caused him to be hospitalized from January 10 to January 25, 1966, and for six days the following February because of his severe allergy. His condition became worse, and he began to suffer a general deterioration of his muscles. He encountered difficulty in walking and occasionally stumbled. He was unable to raise his arms above his head. By March 1, 1966, he had lost about 50 pounds and was so weak that he was unable to take care of himself. He entered a clinic at Fargo, North Dakota, and after examination was hospitalized from March 10 to April 13, 1966. His condition was diagnosed as dermatomyositis, a condition characterized by muscular weakness with a nonspecific eczematous skin eruption or urticaria. The condition is progressive, manifesting itself in swelling of parts of the body, muscular weakness, and skin changes. The patient is unable to perform normal tasks. Although his condition began to improve in August 1966, employee was unable to perform his farm chores at the time of the hearing.

Relators produced a medical witness who testified that the cause of dermatomyositis is unknown. Both he and a neutral physician appointed by the commission agreed that any opinion relating the allergy to the employee's occupation would have to be based solely on speculation and conjecture. The commission, however, agreed with the referee that the testimony of the medical witnesses appearing for employee fairly established that the condition from which employee suffered was work-related.

While the precise nature of the employee's disability is not fully explained in the record, there was medical testimony that the disability could be attributed to the effects of the exposure to the toxic and putrescent atmosphere in which he was required to work. Employee's condition after such exposure was manifested by skin eruptions, swelling of parts of his body, and muscular weakness which rendered him physically disabled for work. The physicians who treated relator concluded that his con-

dition was not due to an inherent physical condition but that it was directly related to the exposure to conditions of his employment. One medical expert concluded:

"* * * (1) This individual had some type of sensitivity or sensitization, some type of auto-immune reaction at the age of 23. (2) He has been exposed to various type[s] of chemicals and grains associated with the working of his farm and the feeding of cattle and also has had exposure to various chemicals used by the State of Minnesota for the control of weeks around the highway around the farm, etcetera. He has never had a serious reaction of any type from these open antigens, (sp), so to speak. He was well until he developed the manifestations of a serious allergen disorder, on his integument, and following this developed serious, almost fatal, muscular inflammation and weakness in a chronological related order directly dating to the time and length of exposure while working at his employment.

"He was subsequently fortunately seen and was given a course of steroids, which he is still taking, which have caused a partial remission in his condition. Therefore, at the present time there is a direct relationship between the exposure and the manifestations of this syndrome and disease of polymyositis or dermatomyositis."

Another medical expert testified:

"Firstly that there was a known exposure to a wide variety of noxious agents as I previously detailed including grain dusts, dirt, dead rats, and various chemicals as well. Secondly that his disease commenced during this period of high exposure; thirdly, that his skin eruption was over the areas that were most heavily exposed, fourthly that following this skin eruption he developed his rather severe and pronounced systemic disease."

We pointed out in Hiber v. City of St. Paul, 219 Minn. 87, 93, 16 N. W. (2d) 878, 881:

"* * * It is not necessary that the truth of an expert's opinion be capable of demonstration; it is sufficient that it is prob-

ably true. 'He [an expert witness] is not required to speak with such confidence as to exclude all doubts in his mind, but may render his testimony in the form of an estimate of opinion, couched in expressions that fall short of absolute conviction of accuracy. Such qualification affects merely the probative force of the testimony.' "

While there is a conflict in the opinions of the opposing medical experts, we have in numerous cases pointed out that it is the peculiar prerogative of the commission to resolve such conflicts in medical testimony, and where its findings have reasonable support in the record, it is not the function of this court to decide whether the commission was correct in arriving at the facts. Martin v. Swift & Co. 269 Minn. 217, 130 N. W. (2d) 522; Golob v. Buckingham Hotel, 244 Minn. 301, 69 N. W. (2d) 636; and Hiber v. City of St. Paul, *supra*.

A discussion of the claims of the parties with reference to whether employee's condition may be considered an occupational disability is not necessary to a disposition of this appeal.

Respondent is allowed $250 attorneys' fees in this court.

Affirmed.